UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| BRIAN A. JEREMIAH, | Case No. 2:21-cv-00618-MK |
| Plaintiff, | |
| v. | OPINION AND ORDER |
| JANTZEN *et al.*, | |
| Defendants. | |

KASUBHAI, Magistrate Judge.

Brian A. Jeremiah (Jeremiah), a self-represented litigant in the custody of the Oregon Department of Corrections (ODOC) filed this action under 42 U.S.C. § 1983 against defendants Officer Jantzen, Officer Main, Captain Woodland, and unnamed officers alleging violations of his rights under the First Amendment and Eighth Amendment. Before the court is defendants' Motion for Summary Judgment. ECF 36. For the reasons set forth below, the court DENIES in part and GRANTS in part defendants' motion for summary judgment. ECF 36.

1 – OPINION AND ORDER

# BACKGROUND

The following facts are undisputed unless otherwise noted:

Jeremiah is an adult in custody (AIC) of ODOC who was held at the Snake River Correctional Institution (SRCI) during the events in question. *See* Am. Compl., ECF 14. In February 2019, Jeremiah was housed in Unit 3H of SRCI. *Id.* On February 7, 2019, Sergeant Stoneman, an SRCI officer, led a search team in Unit 3H. Moura Decl. Ex. 2 at 4, ECF 38. Officer Jantzen was part of that team and searched Jeremiah's cell. *Id.* At that time, Jeremiah was attending chapel and was not in his cell. *Id.* At approximately 7:00 p.m., Officer Jantzen contacted Sergeant Stoneman and reported that he found "an inmate-made weapon" on Jeremiah's desk under some papers and books. *Id.* Officer Jantzen described the weapon as a "pen barrel with a razor blade affixed to it, with about a ½ inch of razor blade sticking out of the end of it." *Id.* At approximately 7:15 p.m., Sergeant Stoneman sent two officers to find Jeremiah and bring him to the disciplinary segregation unit (DSU). *Id.* The officers retrieved Jeremiah from chapel and escorted him to the DSU without incident. *Id.* at 5-6.

After Officer Jantzen searched Jeremiah's cell, he submitted a misconduct report that charged Jeremiah with possession of a weapon. Jantzen Decl. Ex. 1 at 1, ECF 37. In response, Jeremiah claimed that "Jantzen planted the weapon in his cell as retaliation." Moura Decl. ¶ 7. The ODOC Special Investigations Unit (SIU) opened case 19-0084-1 and worked with Oregon State Police (OSP) "to determine who the altered ink pen belonged to." *Id.* at ¶ 8. The SIU/OSP investigation included interviews, document review, polygraph tests, latent fingerprint testing, and touch DNA testing. *Id.* Jeremiah denied all knowledge of the altered ink pen and voluntarily submitted to a polygraph examination as well as fingerprint and DNA testing. Am. Compl. 20; Jeremiah Decl. ¶ (3)(g), ECF 46. An OSP detective analyzed the results of Jeremiah's polygraph

test and "determined that he was truthful and showed no signs of deception in his answers[.]" Moura Decl. at ¶ 9. The investigators were "unable to substantiate the claim that [Jeremiah] owned the altered ink pen." *Id.* at ¶ 9. Regarding Jeremiah's allegation that Officer Jantzen had planted the altered pen, investigators concluded that, "Jantzen did not appear to have had the altered ink pen in his possession prior to confiscating it." *Id.* at ¶ 10. The investigators took no action against Officer Jantzen. *Id.*

Jeremiah was discharged from the DSU on April 4, 2019, and was placed in a general population (GP) unit. Woodland Decl. ¶ 6, ECF 39. Jeremiah alleges the following occurred: During his transfer, he told multiple staff members that he would not be safe in a "gang member unit[.]" Am. Compl. 25. Once Jeremiah arrived in the GP unit, he reported to staff that he and his cellmate "were already getting physical and extortion threats" and asked to be moved. *Id*. The next day, he told Captain Woodland and the lieutenant on duty "that there were threats against sex offenders, me being one of them, in the unit and I needed to be moved ASAP." Jeremiah Decl. ¶ (4)(d), ECF 46. According to Jeremiah, SRCI officers did not take his concerns seriously. Jeremiah alleges that one sergeant suggested that he "stand up to them and fight," and he says that Officer Main laughed and said, "See ya back in DSU!", and that Captain Woodland "shrugged, smiled and said, 'you're general population and it's a G.P. unit." *Id.*

A few hours after Jeremiah spoke to Captain Woodland, he was attacked by one or more AICs and "had [his] orbital fractured, [his] teeth pushed through [his] lip, and a bunch of other facial damage that left scarring." *Id.* Jeremiah alleges that Officer Main, Captain Woodland, and other SRCI officers "knew [he] was going to get assaulted and did nothing[.]" *Id.*

//

//

3 – OPINION AND ORDER

**STANDARDS**

I.  **Summary Judgment**

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

"Because plaintiff is proceeding pro se, the court construes his pleadings liberally and affords him the benefit of any doubt." *Wilson v. Peters*, No. 2:19-cv-01724-AC, 2020 WL 6437606, at *3 (D. Or. Sept. 25, 2020), *report and recommendation adopted*, 2020 WL 6393901 (D. Or. Nov. 2, 2020) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). However, "there is no authority for the proposition that, on motion for summary judgment, that rule operates to lighten the pro se litigant's obligation to show a genuine issue of material fact for trial through the presentation of specific, admissible evidence." *Id.* (citation omitted).

II. **Section 1983**

Section 1983 provides a private right of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "To state a claim under [Section] 1983, a plaintiff [1] must allege the violation of a right

secured by the Constitution and laws of the United States, and [2] must show that the alleged deprivation was committed by a person acting under color of state law." *Naffe v. Frye*, 789 F.3d 1030, 1035-36 (9th Cir. 2015) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). "A cognizable claim under Section 1983 also requires an [AIC] to show causation; that a particular defendant engaged in "'an affirmative act, participat[ed] in another's affirmative act, or omit[ted] to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Wilson*, 2020 WL 6437606, at *3 (citing *Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007) and quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

## DISCUSSION

Jeremiah asserts two claims against defendants. Jeremiah's First Amendment claim alleges that Officer Jantzen planted the altered ink pen in his cell to retaliate against him for filing a grievance and lawsuit against another SRCI officer. Am. Compl. 21. Jeremiah's Eighth Amendment claim alleges that Officer Main, Captain Woodland, and other SRCI officers failed to protect him from being attacked on April 5, 2019. *Id*. at 25-26. Jeremiah brings his claims against defendants in their personal and official capacities. *Id.* at 1.

Defendants argue that they are entitled to summary judgment on three grounds: (1) to the extent that Jeremiah brings his claims against defendants in their official capacity, those claims are barred by the Eleventh Amendment, Mot. 7-8; (2) regarding Jeremiah's retaliation claim, no reasonable jury could find that Officer Jantzen planted the altered ink pen in Jeremiah's cell, *id.* at 8-9; and (3) regarding Jeremiah's failure-to-protect claim, the record does not show that defendants "knew of and disregarded an excessive risk to [Jeremiah]'s safety." *Id.* at 13.

//

I.     **Eleventh Amendment Immunity**

The Eleventh Amendment generally bars a citizen from suing a state in federal court. *See Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 360 (2001). Supreme Court precedent establishes that a state is immune from suit in federal court unless Congress has abrogated the state's immunity by appropriate federal legislation or the state itself has waived it. *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253-54 (2011). Individual defendants who are sued in their official capacities are also protected by Eleventh Amendment immunity. *Brown v. Oregon Dep't of Corr*., 751 F.3d 983, 989 (9th Cir. 2014) ("'Eleventh Amendment immunity extends to actions against state officers sued in their official capacities because such actions are, in essence, actions against the governmental entity[.]'") (quoting *Jackson v. Hayakawa*, 682 F.2d 1344, 1350 (9th Cir. 1982)). "[T]he Eleventh Amendment jurisdictional bar applies regardless of the nature of relief sought[.]" *Krainski v. Nevada ex rel. Bd. Of Regents of Nevada Sys. Of Higher Educ.*, 616 F.3d 963, 967 (9th Cir. 2010) (citing *Papason v. Allain*, 478 U.S. 265, 276 (1986)).

Here, Jeremiah asserts claims against defendants in both their official and individual capacities. *See* Am. Compl. 1. The State of Oregon has not waived its sovereign immunity from suit in federal court. Thus, to the extent Jeremiah sues defendants in their official capacities, those claims are barred by the Eleventh Amendment. *See Johnson v. Oregon*, No. 3:21-CV-00702-MO, 2022 WL 1224897, at *4 (D. Or. Apr. 26, 2022) (dismissing claims against Oregon Department of Human Services officials sued in their official capacities based on Eleventh Amendment immunity).

//

//

**II.     Retaliation Claim**

It is well established that AICs have a First Amendment right to file prison grievances and to be free from retaliation for doing so. *Brodheim v. Cry,* 584 F.3d 1262, 1269 (9th Cir. 2009). "Retaliation against prisoners for their exercise of this right is itself a constitutional violation, and prohibited as a matter of 'clearly established law.'" *Id.* (citation omitted). There are five elements to a First Amendment retaliation claim: "(1) [a]n assertion that a state actor took some adverse action against an [AIC] (2) because of (3) that [AIC]'s protected conduct, and that such action (4) chilled the [AIC]'s exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson,* 408 F.3d 559, 567-68 (9th Cir. 2005) (simplified). A plaintiff who fails to allege a chilling effect may still state a retaliation claim if he alleges that he suffered from some other harm. *Brodheim*, 584 F.3d at 1269 (citing *Rhodes,* 408 F.3d at 568 n.11).

Here, there is no question that filing false charges against an AIC constitutes adverse action. *See Watison v. Carter*, 668 F.3d 1108, 1115 (9th Cir. 2012) (reversing the trial court's dismissal of the plaintiff's retaliation claim because the plaintiff sufficiently alleged that the defendant "took adverse actions against him" by plausibly alleging that he had "filed a false disciplinary charge against him"). However, defendants argue that no reasonable jury could find that Officer Jantzen took adverse action against Jeremiah because the SIU/OSP investigators concluded that "Officer Jantzen did not appear to have had the altered ink pen in his possession prior to confiscating it." Moura Decl. ¶ 10. Defendants fail to explain why, based on that evidence, a reasonable jury would necessarily have to reach the same conclusion. Although the investigators' findings and conclusions regarding the altered ink pen are relevant as to questions about who altered the ink pen and how it showed up in plaintiff's cell, they are not necessarily

7 – OPINION AND ORDER

dispositive. It is not clear, for example, what exact evidence the investigators considered, what witnesses they interviewed, what credibility determinations were made, or what evidentiary standards were employed. Defendants are therefore not entitled to summary judgment based on the results of the investigation.

Defendants argue that no evidence supports Jeremiah's allegation of retaliatory conduct from Officer Jantzen, "other than his own speculation." Mot. 8. The record, however, includes a declaration from Jeremiah that attests under oath that the following factual statements are true:

- I had not seen the [altered ink pen] knife . . . until it was shown to me by the [Oregon State] Police.
- Off. Jantzen had . . . made aggressive and threatening statements toward me because I was filing lawsuits against his co-workers. He looked violently at me and told me not to even look at him. He, on another occasion, when I said I was going to file a grievance against his co-worker, puffed up his chest and lunged toward me and asked if was threatening him. This was in a room with 5 officers, a Sgt. and a Lt. His co-workers stopped him during his approach toward me.
- The knife had none of my DNA on it.
- The knife had no fingerprints on it from me.
- The OSP never did fingerprint or DNA tests on Jantzen to determine whether he was involved, even though there were direct allegations of his involvement.
- I voluntarily submitted to both DNA and fingerprint testing, knowing I had nothing to do with the knife.
- OSP did investigate and fingerprint my cellmate and determined that he also had not had contact with the weapon.
- Jantzen claims to have found the weapon under a stack of six hardback books, on top of my desk, out in plain sight. On its face that is very unlikely for anyone to have put a knife that could get them 5 extra years in prison, on top of their desk, right next to the door to the dayroom, for anyone to see. This allegation is absurd. I did not see or touch the knife, let alone place it under books where it would make them visibly askew and obvious to anyone searching that something was under there.

Jeremiah Decl. ¶¶ a-c, e-j. While defendants argue that this evidence "do[es] not support [Jeremiah]'s supposition that [Officer] Jantzen planted the altered ink pen in his cell[,]" the court disagrees. There is no question that the SIU/OSP investigators were unable to tie either Jeremiah or his cellmate to the altered ink pen, and Officer Jantzen is apparently the only one known to

8 – OPINION AND ORDER

have had contact with the item. Given those facts, Jeremiah's declaration makes it more likely that Officer Jantzen planted the altered ink pen in his cell based on Jeremiah's descriptions of their previous interactions. *See Villescas v. Dotson*, No. 112CV02068SABPC, 2016 WL 5109595, at *10 (E.D. Cal. Sept. 19, 2016) (noting evidence of the defendant trying to discourage the plaintiff from filing grievances and finding such evidence showed that the defendant "retaliated against him because he filed a grievance against [another] officer").

In *Villescas*, a factually analogous case, the plaintiff alleged that the defendant had falsely accused him of violating prison rules in retaliation for the plaintiff filing grievances against the defendant's friend, a fellow corrections officer. 2016 WL 5109595, at *10. To oppose the defendant's motion for summary judgment, the plaintiff submitted a declaration that described the defendant warning him that he would be "written up" if he continued to file grievances. *Id.* Although the defendant argued that the declaration was "self-serving" and therefore improper to consider on a motion for summary judgment, the court disagreed. *Id.* As the court explained, the plaintiff's declaration was sufficient "to create a genuine issue of material fact that [the d]efendant . . . retaliated against him because he filed a grievance against [another] officer" because it was based on "personal knowledge, legally relevant, and internally consistent." *Id.* (simplified); *cf. Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497–98 (9th Cir. 2015) (noting that "[t]he district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence").

Here, as in *Villescas*, "the [c]ourt cannot simply disregard [Jeremiah]'s declaration." *Id.* The court acknowledges that Officer Jantzen submitted his own declaration that supports his account of finding an altered pen in Jeremiah's cell. *See* Jantzen Decl. ¶¶ 5-8. However, even where a "[plaintiff's] affidavit contrasts starkly with the [d]efendants' affidavits, . . . the [c]ourt

9 – OPINION AND ORDER

may not weigh evidence or make credibility determinations on a motion for summary judgment, and any inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party." *Jackson v. Romero*, No. 17CV0882-CAB (BLM), 2019 WL 3288957, at *19 (S.D. Cal. July 22, 2019). "[A] [p]laintiff's evidence need only be such that a 'jury might return a verdict in his favor.'" *Id.* (citing *Anderson*, 477 U.S. at 257). Here, if a reasonable jury credited Jeremiah's declaration over Officer Jantzen's declaration, it could draw the inference that Officer Jantzen took "adverse action" against Jeremiah in retaliation for Jeremiah filing grievances against another officer. *See id.* (noting that, "if a finder of fact credits Plaintiff's version over defendants' version, a finder of fact could draw an inference [of intentionality regarding the] . . . use of force"). Jeremiah's declaration is therefore sufficient to create a genuine issue of material fact as to whether Officer Jantzen planted the altered ink pen in Jeremiah's cell. *See id.*

Last, it is undisputed that an officer planting a weapon in an AIC's cell serves no legitimate penological purpose. Defendants argue that "[Officer] Jantzen's actions served legitimate penological goals," Mot. 9, but their argument assumes that Officer Jantzen conducted a routine search of Jeremiah's cell and found the altered ink pen on Jeremiah's desk, as he claims. *See id.* However, there is a genuine dispute as to whether Officer Jantzen falsely charged Jeremiah with weapons possession, *see supra,* and an officer filing false charges against an AIC serves no legitimate penological interest. *See Watison*, 668 F.3d at 1116 (noting that there is no "legitimate penological reason" for an officer to file a "*false* disciplinary complaint against [an AIC] . . . [or make] *false* statements to the parole board, both in retaliation for grievances [the AIC] had filed") (emphasis in original).

//

10 – OPINION AND ORDER

In sum, Jeremiah's declaration creates a factual dispute as to whether Officer Jantzen planted the altered pen in Jeremiah's cell, and there is no dispute that such conduct constitutes an adverse action and serves no legitimate penological purpose. Therefore, Officer Jantzen is not entitled to summary judgment on Jeremiah's retaliation claim. *See Villescas*, 2016 WL 5109595, at *10 (denying the defendant's motion for summary judgment where the plaintiff's declaration attributed statements and conduct to the defendant that were "consistent with [the] Plaintiff's theory that [the defendant] retaliated against him by issuing a false rules violation report because of the complaint against [another] officer"); *see also Xiong v. Kirkland,* No. 2:09–cv–3345–MCE–GGH, 2012 WL 260006 (E.D. Cal. Jan. 25, 2012) (denying summary judgment to a corrections officer who repeatedly searched plaintiff's cell, finding that the plaintiff's sworn statement, "[e]very time I'd turn in a [grievance], my cell would get searched within that week or within three days," was sufficient to create a triable issue of material fact as to whether there was a retaliatory motivation for the challenged searches).

### III.   Failure-to-Protect Claim

Jeremiah's failure-to-protect claim alleges that he was transferred to an "active gang member unit" at SRCI on April 4, 2019, and was attacked the next day. Am. Compl. 25. Jeremiah states he is a sex offender and alleges that he "told all of the listed defendants . . . about actual threats against me on the unit and pleaded to be moved[,]" but "[t]hey refused to move me and even taunted me, knowing I was going back to the hole for more abuse." Resp. 3, ECF 45. Defendants argue they are entitled to summary judgment because "[e]vidence of nonspecific threats is insufficient to support the objective component" of Jeremiah's claim and because Officer Main and Captain Woodland "did not know of and disregard an excessive risk to [his] safety." Mot. 13.

11 – OPINION AND ORDER

The Eighth Amendment imposes a duty on prison officials "'to protect [AIC]s from violence at the hands of other [AIC]s.'" Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005) (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994)). The failure of prison officials to protect an AIC from attack by another AIC may rise to the level of an Eighth Amendment violation when two criteria are met. Farmer, 511 U.S. at 534. First, the alleged deprivation "must be, objectively, sufficiently serious." Id. (simplified). The AIC must show that he is or was "incarcerated under conditions [that] pos[ed] a substantial risk of serious harm." Id. Second, the prison official must have a sufficiently culpable state of mind, one of "deliberate indifference" to AIC health or safety. Id. This means that "the official knows of and disregards an excessive risk to [AIC] health or safety." Id. at 837. The official "must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Id. However, "prison officials who actually knew of a substantial risk to [AIC] health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id.

Defendants argue that Jeremiah cannot show that he faced "a substantial risk of serious harm" in the GP unit. Mot. 11, ECF 36. Jeremiah responds that "[he] told all of the listed defendants . . . about actual threats against [him] on the unit and pleaded to be moved." Resp. 3. In Chandler v. Amsberry, No. 3:08-CV-00962-SI, 2014 WL 1323048, at *1 (D. Or. Mar. 28, 2014), this court considered a similar argument brought by an AIC who, like Jeremiah, alleged a serious risk of harm from other AICs based on his status as a sex offender. Although the plaintiff in Chandler based his claim on a threat of future harm and not an actual injury, as Jeremiah does here, the analysis is instructive regarding the circumstances under which an AIC sex offender may be exposed to an objectively serious risk of harm. See id.

12 – OPINION AND ORDER

In *Chandler*, the plaintiff claimed that, "[as] a sex offender, he [was] a 'vulnerable' prisoner and, therefore, face[d] a substantial risk of serious harm . . . in the general population." *Id.* at *8. This is identical to Jeremiah's assertion that he has "charges of a sexual nature and therefore [is] part of a group that is routinely assaulted by gang members." Resp. 4. In *Chandler*, this court acknowledged that an AIC may be vulnerable in prison as a sex offender, but noted that such vulnerability "does not automatically equate to a substantial risk of serious harm whenever that [AIC] is . . . with the general population." *Id.* As the court explained, "[s]uch a threat is too general and speculative to reach a constitutional dimension." *Id.* Although the court noted that there may be a substantial risk of harm "where vulnerable prisoners and aggressive prisoners are placed together, unsupervised and unpatrolled," it emphasized that, "[s]peculative and generalized fears of harm the hands of other [AIC]s do not rise to a sufficiently substantial risk of serious harm to [an AIC]'s future health." *Id.* at *7-8 (simplified).

Here, Jeremiah alleges more than "generalized fears of harm" by alleging that he and his cellmate received "physical and extortion threats" on Jeremiah's first day in the GP unit and alleging there "were active threats and extortion being directed toward me and my cellmate." *See* Am. Compl. 25. Jeremiah supports his allegations with a sworn declaration in which he attests that "[he] told Cpt. Woodland and the Lt. on duty that there were threats against sex offenders, [him] being one of them, in the unit and [he] needed to be moved ASAP." Jeremiah Decl. ¶ (4)(d). He attests further that, "[he] told Lt. King and Off. Main of the escalating threats and tension[.]" *Id.* ¶ (4)(e).

Defendants do not specifically dispute that Jeremiah approached several officers to express concerns about his safety in the GP unit. Instead, they argue that, "while [Jeremiah] may have relayed these concerns, he did not provide defendants with specific information about who

13 – OPINION AND ORDER

was threatening him," and they argue that, "[e]vidence of nonspecific threats is insufficient to support the objective component of deliberate indifference." Mot. 13. Defendants cite *Chandler* to support their argument, but the plaintiff in *Chandler*—unlike Jeremiah— alleged only that he had been "subjected to *implied* threats through hostile stares and body language and offensive comments." 2014 WL 1323048 (emphasis added). Further, the court found that the plaintiff failed to "present evidence of a specific or direct threat of imminent bodily harm[.]" *Id.* at *8. Thus, although the plaintiff insisted that he, as a sex offender, faced a substantial risk of serious future harm in a general population unit, the court noted that "[g]eneral intimidation, harassment, and nonspecific threats . . . do not demonstrate a constitutionally intolerable risk of harm." *Id.*

Here, Jeremiah's failure-to-protect claim does not rest on allegations of speculative fears. Jeremiah alleges there were "*actual* threats against [him] and [he] pleaded to be moved." Resp. 3 (emphasis added). Moreover, there is no question that Jeremiah was actually attacked by other AICs in the GP unit shortly after Jeremiah reported that he was being threatened, and that evidence is further indication that he was "exposed to an objectively intolerable risk of harm upon his placement in [the GP unit]." *Funk v. Schriro*, No. CV08-0739-PHXGMSJCG, 2009 WL 4898262, at *7 (D. Ariz. Dec. 14, 2009). In *Funk*, the plaintiff alleged that he was "forced to endure a 'constant threat of violence,'" but he was never attacked by other AICs, and he failed to explain "how he suffered after the transfer." *Id.* Although the court acknowledged that an AIC "need not wait until he is actually assaulted" to bring a failure-to-protect claim, the threats that the plaintiff alleged he received were simply "too general and conclusory to make the objective showing required on an Eighth Amendment claim." *Id.* (citing *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Here, in contrast, a reasonable jury could find, based on Jeremiah's evidence, that he was threatened with harm once he arrived in the GP unit, that the threats and

tension escalated on his first day in the GP unit, and that he was attacked shortly after lunch on his second day in the unit. *See* Jeremiah Decl. ¶ (4)(a)-(f). Viewing that evidence in the light most favorable to Jeremiah, the court finds that it sufficiently shows that he faced "an excessive risk to [his] health or safety" when they transferred him to the GP unit. *Farmer*, 511 U.S. at 837.

Next, defendants argue that Jeremiah cannot establish the subjective element of a failure-to-protect claim because he "only . . . provided nonspecific information" about the threats he received and failed to "provide defendants with specific information about who was threatening him[.]" Mot. 13-14. However, the Ninth Circuit recently reversed a district court's entry of summary judgment for the defendants on a failure-to-protect claim and emphasized the following:

> The deliberate indifference standard 'does not require that the guard or official believe to a moral certainty that one [AIC] intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault,' however, the official must have more than a mere suspicion that an attack will occur.

*Leonard v. Peters*, No. 21-35471, 2023 WL 387035, at *2 (9th Cir. Jan. 10, 2023) (citing *Berg v. Kincheloe*, 794 F.2d 457 459 (9th Cir. 1986). In *Leonard*, the court found that the defendants had "more than a 'mere suspicion' that another [AIC] would attack [the plaintiff]" because he sent multiple kytes to officials informing them that "gang members were threatening and harassing him" and "asking to be transferred to a different unit." *Id.* at *1. Even though the plaintiff—like Jeremiah—"did not specify exactly who might attack him or exactly when the attack would occur," the court noted, "'[i]t does not matter whether the risk came from a particular source.'" *Id.* (citing *Farmer*, 511 U.S. at 826) As the court explained, the plaintiff sufficiently "warned [the defendants] of a potential attack" when he sent kytes to them that "repeatedly detailed threats, incidents of harassment, and 'faux' swings." *Id.* Thus, despite the plaintiff's failure to

15 – OPINION AND ORDER

pinpoint the source of the threats or details about the threatened attack, the evidence still demonstrated that the defendants were "subjectively aware" that the plaintiff had been threatened and was therefore at risk of serious harm. *Id.*

Here, Jeremiah similarly communicated a "'dangerous situation'" to defendants when he told them he "would not be safe" in the new unit as a sex offender and reported "that there were threats against sex offenders . . . in the unit." Jeremiah Decl. ¶ (4)(d). First, defendants do not dispute that Jeremiah was particularly vulnerable to attack as a sex offender. Furthermore, Jeremiah alleges that he informed defendants that he and his cellmate "were already getting physical and extortion threats" on their first day in the GP unit, Am. Compl. 25, and he attests that he informed defendants of "escalating threats and tensions" after he spent his first night in the new unit. Jeremiah Decl. ¶(4)(e). Although Jeremiah indicates that he reported fewer and less detailed threats to defendants than those reported to the defendants in *Leonard*, Jeremiah's undisputed status as a sex offender and the attack he suffered—coupled with the threats he received—are enough to raise a genuine issue of material fact as to whether defendants "had more than a mere suspicion" that Jeremiah would be attacked. *See Leonard*, 2023 WL 387035, at *2. Put differently, there is sufficient evidence that defendants were subjectively aware that Jeremiah faced a substantial risk of serious harm when they transferred him to the GP unit. *See id.* (noting that a prison official's subjective awareness that an AIC faces a significant risk of harm "may be established through an 'inference from circumstantial evidence'").[1]

---

[1] The court acknowledges that, in *Leonard,* the plaintiff's evidence of the defendants' deliberate indifference included the fact that the plaintiff's assailant had previously attempted to attack the plaintiff and had been disciplined. *See* 2023 WL 387035, at *2 (noting that the plaintiff's kytes and warnings, "coupled with" the prior attempted assault against him, were "sufficient circumstantial evidence" that the defendants "were subjectively aware of a serious threat to [the plaintiff]"). Before the Ninth Circuit took notice of the attempted assault, however, it focused on

16 – OPINION AND ORDER

In sum, based on the record before the court and viewing the evidence in the light most favorable to Jeremiah, a reasonable jury could find that defendants were deliberately indifferent to a serious risk of harm that Jeremiah faced in the GP unit. However, "prison officials who actually knew of a substantial risk to [AIC] health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Here, a reasonable jury could find that defendants did not act reasonably based on Jeremiah's allegations that: (1) before he was transferred to the GP unit, he told multiple officers that he would not be safe there, but "they did nothing . . . and would not go to the Sgt. who works on DSU releases to get it changed"; (2) on the day of his transfer, he told the sergeant on duty that he had received "physical and extortion threats," but the sergeant "said he would not move me but that I should just stand up to them and fight the gangs"; (3) the same day, he spoke to a lieutenant and Officer Main about the threats and "asked them to move me before I got assaulted or killed," but they "both refused" and Officer Main laughed and said, "see ya back in DSU!"; (4) the next morning, Jeremiah spoke with Captain Woodland about the threats, but he "shrugged, smiled, and said, 'you're in general population and it's a GP unit"; and (5) a lieutenant who overheard Jeremiah's conversation with Captain Woodland "scolded [him] for speaking to the captain and not going to him" and "refused to help[.]" Am. Compl. 25-26.

//

---

the threats against the plaintiff and found that those threats and the plaintiff's repeated requests to be moved "created more than a mere suspicion' that another [AIC] would attack [the plaintiff]." *Id.* Thus, the attempted assault on the plaintiff in *Leonard* was not dispositive to the court's finding regarding the defendants' deliberate indifference. *See id.*

17 – OPINION AND ORDER

Defendants argue that they failed to transfer Jeremiah because he only "provided nonspecific information that would not have provided the basis for transferring him to a different housing unit," and because he had the option to "voluntarily sign into the Special Housing Unit in DSU." Mot. 14-15. Assuming both things are true, and assuming Jeremiah was reminded of the DSU option, as defendants contend, it is still not clear why TRCI officers apparently minimized, discounted, and even mocked Jeremiah's reports that he would not be safe in the GP unit. It is also not clear why defendants apparently failed to seek further information from Jeremiah, refer him to someone who could assist him, or take any step to investigate his reports that he and other sex offenders were being threatened. Because defendants do not specifically argue that they acted reasonably in response to Jeremiah's requests to be moved, and because a reasonable jury could find that defendants acted unreasonably by failing, at a minimum, to inquire into Jeremiah's reports of threats, defendants are not entitled to summary judgment on Jeremiah's failure-to-protect claim. *See Leonard*, 2023 WL 387035, at *2-4 (reversing the district court's entry of summary judgment for the defendants on a failure-to-protect claim where the defendants were aware that the plaintiff faced a serious risk of harm in his new unit based on the threats he had received, and where the defendants failed to "take reasonable measures to mitigate the threat of harm").

## CONCLUSION

For all these reasons, defendants' Motion for Summary Judgment (ECF 36) is: (1) GRANTED to the extent Jeremiah sues defendants in their official capacities; and (2)

//

//

//

18 – OPINION AND ORDER

DENIED regarding Jeremiah's retaliation claim against Officer Jantzen and regarding his failure-to-protect claim against Officer Main, Captain Woodland, and the unnamed officers.

IT IS SO ORDERED.

DATED this 2nd day of February 2023.

s/ Mustafa T. Kasubhai  
MUSTAFA T. KASUBHAI (He / Him)  
United States Magistrate Judge